UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JONATHAN REINSCHMIDT, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>ZILLOW, INC., et al.,<br><br>      Defendants. | No. C12-2084 RSM<br><br>CLASS ACTION<br><br>ORDER GRANTING MOTION TO DISMISS |

## I. INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss for Failure to State a Claim (Dkt. # 63) and their Request for Judicial Notice (Dkt. # 65). Purchasers of Zillow, Inc. ("Zillow") common stock brought this securities class action lawsuit under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5") promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs allege that between February 15, 2012 and November 6, 2012 (the "Class Period"), Zillow and individual Defendants Spencer Rascoff, Lloyd Frink, Chad Cohen, and Richard Barton, issued materially false and misleading statements about Zillow's business practices and

financial results, which allowed its stock to trade at artificially inflated prices. Putative class members contend that when Zillow's misrepresentations came to light, Zillow's inflated share price dropped causing substantial economic harm to investors. For the reasons that follow, the Court agrees with Defendants that the allegations of the Consolidated Class Action Amended Complaint ("CAC") fail to state a claim under Fed. R. Civ. P. 12(b)(6). The motion to dismiss is granted.

## II.  BACKGROUND

The CAC makes the following factual allegations. Zillow is an online real estate marketing company that derives its revenue from online advertisements by real estate agents and mortgage professionals. Dkt. # 52, CAC, ¶¶ 2, 44 (hereafter cited as Dkt. # 52). Part of Zillow's advertising revenue is generated on a subscription basis from local real estate professionals (the "Premier Agents"). *Id.* at ¶¶ 42, 47. Throughout the Class Period, Plaintiffs allege that Defendants made material misstatements and omissions concerning (1) average subscription pricing; (2) average revenue per subscriber (referred to as "ARPU"); and (3) Premier Agent reaction to a new pricing model. Zillow also failed to disclose certain information about its relationship with Foreclosure.com, one of its display advertising customers. *See id.* at ¶¶ 17, 19, 110.

At the start of the Class Period, Zillow announced that it was going to implement a new pricing model for its Premier Agent program. *Id.* at ¶¶ 5, 49-53. Although Zillow previously sold Premier Agents a finite number of advertising spaces per zip code, it now planned to charge subscribers for the number of webpage "impressions" (*i.e.*, the number of times potential home buyers viewed the webpage) it delivered within a given zip code. *Id.* at ¶ 51-52. Zillow also

introduced three levels of subscription tiers for its Premier Agents: "Platinum," "Gold," and "Silver." *See id.* at ¶ 49.

During the Class Period, Defendants stated that average pricing of Premier Agent subscriptions had increased under the newly implemented pricing model. For example, on February 15, 2012, Defendants represented that Zillow had experienced an increase in the average price for new Platinum Premier Agent contracts during the year. *Id.* at ¶ 107 ("Existing Premier Agents, who are no longer in contract, [are] also starting to pay new and generally higher prices in order to renew their subscriptions for additional six-month terms."). Further, Defendants made statements that Zillow was successfully implementing the new Premier Agent pricing program. *See, e.g.*, *id.* (Defendants stated "it's only been a few months, but initial reaction to the new tiers has been positive and we're introducing more agents to the value of Zillow").

Plaintiffs allege that contrary to the information Defendants conveyed to the market during the Class Period, Zillow was experiencing difficulty implementing the new pricing model, as evidenced by "Zillow's Static Average Revenue Per Customer" (ARPU). *Id.* at p. 27. "Prior to and throughout the Class Period, investors and analysts wanted Zillow to disclose ARPU because it would show the average subscription revenue generated by each Premier Agent, *and thus whether Zillow was successfully implementing its new Premier Agent pricing plan*." *Id.* at ¶ 78 (emphasis added). The CAC alleges that Zillow disclosed ARPU "only after the SEC sought disclosure of [] ARPU in the third quarter of 2012 . . . ." *Id.* at 80. On November 5, 2012, Zillow disclosed that ARPU was $263 in 1Q12, $263 in 2Q12, and $270 in 3Q12. *Id.* at ¶ 84. The CAC alleges that "essentially flat" (*id.*) ARPU "revealed that Zillow had been experiencing rapid growth in pricing until it implemented the new pricing model." *Id.* The CAC alleges that when

Zillow finally disclosed ARPU ("after continu[ing] to conceal that ARPU had not been increasing as a result of the new pricing policy"), the disclosure "shocked the market on the last day of the Class Period." *Id.* at ¶¶ 167, 211.

The CAC alleges that Zillow's failure to disclose Premier Agent churn[1] until the end of the Class Period further obfuscated that "Zillow had not been smoothly rolling out its new pricing plans for the Premier Agent program so as to maximize revenue and profitability." *Id.* at ¶ 178. The CAC marshals statements from former Zillow employees (the confidential witnesses or "CWs") to "reveal[] that churn was an increasing problem for Zillow during this time period." *Id.* at 177. Plaintiffs allege that Defendants disclosed the existence of churn at the end of the Class Period, by referencing acquisitions designed to reduce agent churn and by acknowledging that Zillow had increased its sales force to "increase Premier Agents' [return on investment] so that they would continue to purchase advertising from Zillow." *Id.* at 181.

Plaintiffs' second fraud theory concerns Zillow's failure to disclose that it had terminated its advertising relationship with Foreclosure.com. In addition to marketplace revenue, Zillow also obtained revenue from its display advertising business. Foreclosure.com was one of its display advertising customers. *Id.* at ¶ 90. Plaintiffs allege that over the Class Period, Defendants stated that display advertising revenue would continue to contribute to Zillow's total revenue. *Id.* at ¶ 109. They allege that the "sudden announcement of the loss of Forclosure.com" on November 5, 2012, further contributed to "Zillow's stock collapse[]" on November 6, 2012. *Id.* at ¶ 192.

### III. DISCUSSION

---

[1] Churn is defined in the CAC as "the rate of attrition, or rate at which Zillow's subscribers leave during a given period of time. *Id.* at ¶¶ 9, 54.

**A. Judicial Notice**

Defendants ask that the Court take judicial notice of three categories of documents attached to the Knowles Declaration as exhibits A-S, and the Supplemental Knowles Declaration as exhibit T: (1) Forms 10-K and 10-Q filed by Zillow with the United States Securities and Exchange Commission ("SEC"), (2) transcripts of Zillow's quarterly earnings conference calls, and (3) analyst reports.  Generally, courts may only consider the complaint and any materials properly submitted with it when ruling on a Rule 12(b)(6) motion. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). Courts may, however, take judicial notice of a fact that "is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Such materials may be considered without converting the motion into one for summary judgment. *Barron v . Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  Courts may also consider "[d]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading . . . ." *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (quotation marks and citation omitted).  For such documents that have been incorporated by reference into the complaint, the court may "consider the full texts of the documents which the complaint quotes only in part." *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997).

Exhibits A-I, Q, R, and T are documents that were referenced or quoted in the CAC. Plaintiffs do not oppose the Court's consideration of these documents. Exhibits J-P and S are analyst reports not specifically identified in the CAC, which Plaintiffs contend are offered by Defendants to resolve disputed issues of fact and thus not properly subject to judicial notice.

"[C]ourts routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public." *In re Century Aluminum Co. Sec. Litig.*, C 09-1001 SI, 2011 WL 830174, *9 (N.D. Cal. Mar. 3, 2011) *aff'd*, 704 F.3d 1119 (9th Cir. 2013) and *aff'd*, 729 F.3d 1104 (9th Cir. 2013). To resolve the question of whether Zillow's alleged misrepresentations and omissions were material, the Court must determine whether there was "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Patel v. Parnes*, 253 F.R.D. 531, 548 (C.D. Cal. 2008) (quotation marks and citations omitted).

The CAC quotes from and relies heavily on analyst reports to support the allegations that Zillow misled the market about ARPU, the success of its new pricing model, and Foreclosure.com. While the competing analyst reports proffered by Defendants may not be considered "for the truth of their contents" (*In re Rackable Sys., Inc. Sec. Litig.*, C 09-0222 CW, 2010 WL 3447857 (N.D. Cal. Aug. 27, 2010)), the Court may properly look to those reports to understand the "total mix" of information available to investors over the class period. *See Patel*, 253 F.R.D. at 548 (finding analyst reports judicially noticeable for the purpose of determining when and what information was available to the market). Accordingly, Defendants request for judicial notice will granted for the exhibits that are incorporated by reference in the CAC, and for analyst reports for the limited purpose of considering what information was disclosed to the market and at what point during the class period.

**B. Legal Standard**

In reviewing a motion to dismiss a case involving securities fraud allegations, this Court must engage in a three-part analysis. First, on a motion to dismiss for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. This requirement is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Absent facial plausibility, Plaintiffs' claims must be dismissed. *Twombly*, 550 U.S. at 570.

Second, when a complaint alleges violations under Section 10(b) of the 1934 Act and Rule 10b-5, the Court must examine the pleadings for compliance with the particularized pleading requirement found in Federal Rule of Civil Procedure 9(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). The Ninth Circuit has long applied the heightened pleading standard of Rule 9(b) to securities fraud complaints, and therefore requires the element of falsity, or "a material misrepresentation or omission of fact," to be pled with particularity. *See id.* (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985) and *Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001)).

Third, the Court must examine the pleadings under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Since 1995, courts have been required to scrutinize securities fraud complaints under the more exacting standards of the PSLRA. The PSLRA amended the Securities Exchange Act to require that a securities fraud complaint "plead with particularity both falsity and scienter." *Zucco*, 552 F.3d at 990 (quoting *Ronconi*, 253 F.3d at 429). To

properly allege falsity, a securities fraud complaint must now "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). To the extent that an allegation regarding a statement or omission is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.* In doing so, the plaintiff must "reveal 'the sources of [his] information.'" *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

In addition, under the PSLRA, to properly allege scienter the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In other words, the plaintiff must plead with particularity the facts evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)). To satisfy the PLSRA's rigorous pleading standards, the complaint's scienter allegations must give rise not just to a plausible inference of scienter, but to an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324.

This scienter analysis is different from the ordinary Rule 12(b)(6) standard. On a typical 12(b)(6) motion, the Court makes all reasonable inferences in favor of the plaintiff. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570)). Under the PSLRA, the Court must weigh competing inferences and "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing inference." *Zucco*, 552 F.3d at 991.

**C. § 10(b) Claims**

Rule 10b–5 implements the anti-fraud provisions of section 10(b) of the Securities Exchange Act. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014) ("*Intuitive*"). Under Rule 10b-5, it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim for securities fraud, the complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, _ S. Ct. _, No. 13-317, 2014 WL 2807181, *6 (June 23, 2014).

To state an actionable securities fraud claim, a securities complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and , if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all the facts on which that belief is formed.'" *Zucco*, 552 F.3d at 990-91. Further, to satisfy the materiality requirement of Rule 10b-5, "the complaint must allege facts sufficient to support the inference that there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Intuitive*, 759 F.3d at 1058 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988)).

1. <u>Marketplace Revenue Fraud Allegations</u>

The CAC's marketplace revenue fraud allegations are mainly directed to Zillow's failure to disclose ARPU before Q3 2012; and Zillow's statements concerning implementation and success of the impression-based pricing model (the "churn" allegations).

    *a. ARPU Allegations*

The CAC fails to identify any affirmative statement made by Defendants that ARPU had increased over the class period. And although Plaintiffs allege that Zillow's failure to disclose a decreasing or "essentially flat" ARPU over the class period was fraudulent, the CAC itself demonstrates that analysts estimated that ARPU was in fact decreasing over the class period. *See, e,g.*, Dkt. # 52 at ¶ 79 ("PAA analyst calculated ARPU in 2Q12 as $316.70 and estimated ARPU for 3Q12 as $307.20"); *id.* at ¶ 157 ("Canaccord/Genuity believed Zillow's ARPU was $317 (down from $321 during 1Q12)"); *see id.* at ¶ 158 ("PAA Research issued an August 8, 2012 analyst report that noted: 'Zillow added 4,080 premier agents Q/Q in 2012, well above our estimate for 2,500 adds. However, ARP[U] . . . of $316.66 fell short of our estimate of $336.27.'"). Thus, the CAC shows that analysts estimated ARPU as decreasing and it shows that this information was available to investors. Moreover, the CAC concedes that Defendant Cohen acknowledged that ARPU was down on August 7, 2012. *Id.* at ¶ 143 ("So if you do the brute force math on the ARPU, looking at our total marketplace revenues, yes, I can see that ARPU is down.").

"Where information has been made credibly available to the market by other sources[,]" a failure to disclose that information is not actionable. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989). The CAC makes clear that the market had sufficient information concerning ARPU before Zillow disclosed the actual numbers in 4Q12.

Perhaps cognizant that investors were well informed about flat or decreasing ARPU, Plaintiffs allege that Defendants sent confusing messages about ARPU, which lead investors to think ARPU could have been increasing. *See id.* at ¶ 143. The CAC, the referenced documents, and the analyst reports, however, show that Zillow's statements and analyst estimates were consistent about ARPU. Zillow disclosed that "ARPU [was] down." *Id.* Zillow also disclosed a probable reason for decreasing ARPU: growth in the number of lower-tier subscriptions. *Id.* ("with the growth of those other two tiers, Gold and Silver, that had the effect of bringing the ARPU down, if you just look at the math").

Analysts reported similar information. As discussed above, analysts predicted that ARPU was decreasing. Consistent with Zillow's representation that ARPU was impacted by growth in the lower-subscription tiers, analysts acknowledged that lower-tier growth would impact ARPU and predicted that such growth may benefit Zillow going forward. For example, Canaccord/Genuity's August 20, 2012 "Daily Letter" stated that "[w]e believe the strategy of signing on new agents on the Silver tier will likely result in . . . greater agent growth and lower ARPU." Dkt. # 64-1, Knowles Decl., Ex. H., pp. 5-6. The report further noted that "this dynamic would net out two significant positives: (1) higher overall revenue today; and (2) a bigger pool of lower-tier agents to sell advertising and marketing services to in the future." *Id.* Similarly, PAA Research's August 8, 2012 report stated that "Zillow management has not indicated how many silver subs[criptions] were added in the quarter, but we anticipate this was probably the largest single factor in the sequential decline and YOY slowdown of ARP[U]." *Id.* at Ex. G., p. 5. Thus, investors were made aware that ARPU declined and that it was impacted by an increase of lower-tier subscriptions. Even if Zillow had produced actual ARPU over the class period, it is

implausible that the disclosure would have affected the total mix of information already available to the market.

Further, to the extent the CAC implies that Zillow's failure to disclose ARPU was an actionable omission, it fails to plausibly allege that Zillow had a duty to make such disclosures. "Omissions are actionable under . . . Rule 10b-5 . . . only if the party omitting the fact had a duty to disclose that fact." *In re Amgen Sec. Litig.*, 544 F. Supp. 2d 1009, 1029-30 (C.D. Cal. 2008) (citing *Chiarella v. United States*, 445 U.S. 222, 230 (1980)). Plaintiffs argue that the disclosure of ARPU was necessary to counter-balance the positive statements Zillow made about the success of its new pricing model, and the success and growth of its business generally. Defendants contend that Zillow had neither an affirmative duty to disclose ARPU, nor did it have a duty to disclose it to "make . . . statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

The CAC construes the SEC's August 20, 2012 and August 30, 2012 letters as compelling Zillow to disclose ARPU. The CAC fails to plausibly allege, however, that the SEC's comment letters mandated that Zillow amend its public SEC filings to disclose ARPU.  The CAC states that on August 20, 2012, Kathleen Collins, Accounting Branch Chief at the SEC, wrote to Defendant Rascoff and requested additional disclosures of financial information for Zillow's 2012 Form 10-K. Dkt. # 52, ¶ 80. The CAC then alleges that in response, Defendant Cohen stated that "Zillow did not disclose ARPU because it was not 'meaningful' to investors: '[T]he average subscription price per Premier Agent subscriber is not meaningful because Premier Agent subscribers are not limited in the amount or nature of inventory they may purchase (*i.e.*, agents may purchase multiple zip codes).'" *Id.*

The SEC sent its response on August 30, 2012. The letter stated as follows:

> Your current MD&A disclosures attribute the increase in marketplace revenue to the increase in the number of subscribers, which you quantify, and an increase in the average price paid for Premier Agent subscriptions sold during the period, which you do not quantify. We understand from your response to prior comment 1 that subscription prices vary significantly across zip codes. However, it is unclear why that would preclude you from discussing, at a minimum, the percentage increase in the average price paid for Premier Agent subscriptions. Further, to the extent that the average price paid per subscription is being impacted by sales in certain regions, it would seem that such information would also be meaningful to investors. Please explain further why you cannot quantify this information and tell us your consideration to include a discussion regarding how the various regions (zip codes) impact your results of operations. Lastly, please clarify whether management uses average price information in any form (either on a company-wide basis or by region) as a performance indicator in managing your business.

*Id.* at ¶ 81. The CAC further alleges that "[a]s a result of the SEC's prodding, Cohen reversed course, conceding in an August 31, 2012 letter that "disclosure of the average monthly Premier Agent revenue per Premier Agent subscriber may be meaningful as a performance indicator in managing the company business" and that Defendant Cohen would "disclose the average monthly Premier Agent revenue per Premier Agent subscriber on a company wide basis" in future quarterly and annual reports. *Id.* at ¶ 82.

Notwithstanding the equivocal language employed by the SEC in requesting additional disclosures from Zillow, *the SEC did not ask, much less require, Zillow to disclose ARPU*. Plaintiffs' allegations misleadingly conflate ARPU with the price Zillow charged its subscribers under the new pricing model. Critically, while the two metrics may be related, they are not the same. What the SEC sought from Zillow was further disclosure concerning Zillow's assertions that it was charging higher prices on average for Premier Agent subscribers. It did not ask Zillow to disclose the ARPU metric. Investors were aware that Zillow was selling more lower-tier

subscriptions, which would effectively lower ARPU's growth. The CAC also concedes that "a substantial portion of these new subscribers were lower margin Silver and Gold-level agents." *Id.* at ¶ 68. But the revelation that there was an influx of lower-tier subscriptions provides no information about the price Zillow charged its subscribers. Plaintiffs' central theory is that contrary to Zillow's public statements, it was not actually increasing its subscription pricing, as evidenced by decreasing ARPU. It is entirely possible, however, that Zillow increased the average price per subscriber and still experienced flat ARPU because it was selling more lower-teir subscriptions. Plaintiffs' allegations merely speculate that lower ARPU meant that Zillow was not actually charging higher subscription prices. Such speculation is insufficient to state a claim for an actionable omission. *See e.g.*, *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1230 (M.D. Fla. 2002) ("it is not enough to be actionable [under Rule 10b-5] for a defendant to simply omit information potentially of interest to investors, but rather the omission must render statements actually made misleading").

The Court notes further, that when Zillow did disclose ARPU for the first time on November 5, 2012, some analysts construed the actual ARPU numbers favorably. *See e.g.*, Dkt. # 64-1, Knowles Decl., Ex. K ("Zillow disclosed Premier Agent ARPU grew 2.7% sequentially and 11.6% y/y to $270 from $263 last quarter. We note that this is the first time management has disclosed this metric, and we believe it is bullish for the company to be able to have such a firm beat on subscriber adds while also growing ARPU. This reinforces the notion that most of the subscriber adds are Platinum tier."). Because the SEC did not require Zillow to disclose ARPU, and because ARPU's eventual disclosure could not plausibly render Zillow's statements about higher subscription prices false or misleading, Zillow had no duty to disclose ARPU during the class period.

    *b. Churn Allegations*

Plaintiffs' churn allegations also fail to allege an actionable omission. Plaintiffs allege that Zillow experienced "an increasing rate of churn" because "agents were cancelling their Platinum subscriptions." Dkt. # 52, ¶ 68. They argue that Zillow's failure to disclose the level of churn rendered statements about positive customer reaction to the new pricing model false or misleading. At most, the positive agent-reaction statements identified in the CAC constitute non-actionable corporate optimism. "'[V]ague, generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal securities laws." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quoting *Glen Holly Entm't v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)). "Although projections and general statements of optimism may trigger liability under federal securities laws, statements that are so vague or amorphous that no reasonable investor could rely on them are not actionable." *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994) (internal citation omitted), *aff'd,* 95 F.3d 922 (9th Cir. 1996). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

    In *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012), the court found that statements such as "[w]e are very pleased with our progress to date on key strategic initiatives" and "so far we are getting really great feedback" were non-actionable generalized statements of corporate optimism. It noted that such statements were, "in essence, 'feel good' statements . . . on which investors do not rely . . . ." *Id.* at 1037. Here, the alleged false statements related to agent reaction fall under this category.

For example, the CAC identifies the following statements as false or misleading:

- "[i]t's only been a few months, but initial reaction to the new tiers has been positive and we're introducing more agents to the value of Zillow." Dkt. # 52, ¶ 107 (alteration in original).

- "First, revenue grew ahead of expectations in our marketplace category, due to the ongoing strength in our Premier Agent business, . . ." *Id.* at ¶ 141.

- "So everything is going as planned. Agents are happy with the switch that we have made, and obviously this allows us to benefit from our traffic growth that we have brought to the platform." *Id.* at 144.

Such statements project non-specific corporate optimism about the strength of Zillow's marketplace business.

Although optimistic statements may be actionable "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy" (*Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994), the undisputed facts demonstrate the Zillow's optimism was reasonably grounded because its revenues in fact increased over the class period. *See* Dkt. # 69-1, Knowles Decl., Ex. L at p. 4 (revenues of $19.9 million in 4Q11); *id.*, Ex. J at p. 6 (revenues of $22.8 million in 1Q12, $27.8 million in 2Q12, and $31.9 million in 3Q12). It is also undisputed that Zillow increased the number of Premier Agent subscribers during the class period. *See id.* at Ex. B ("This [y/y revenue] increase is primarily the result of an 80% increase in our Premier Agent subscribers to 26,703 as of September 30, 2012 from 14,876 as of September 30, 2011 . . . .").

Further, and contrary to Plaintiffs' assertions that Defendants failed to acknowledge churn before the end of the class period, Defendants disclosed that agent reaction to the new pricing plan was mixed. On February 15, 2012, Defendant Rascoff explained agent reaction to increased pricing as follows:

> When an agent is contacted, though, and says, look, you were paying $100 a month six months ago when you signed up, and the zip code that you purchased was getting this amount of exposure, this amount of views, and this many contacts, and now six months later here we are, our traffic is doubled, so on and so forth, the price is $200, what would you like to do, the reaction is mixed. . . . because sometimes agents have a particular dollar figure that they're trying to allocate to this particular marketing channel. So I would say it's mixed.

Dkt. # 64-1, Knowles Decl., Ex. C, p. 8. This statement shows, that as early as February 2012, Defendant Rascoff predicted that not all agents would react positively to the impression-based pricing model. Similarly, on August 9, 2012, Zillow filed its Form 10-Q quarterly report. The report stated that "we have changed in the past, and expect in the future to make changes to, our pricing methodology for certain of our advertising services, and it is possible that such changes may cause advertisers to reduce their advertising with us or choose not to advertise with us." *Id.* at Ex. E, p. 29. These statements prepared investors for the unremarkable possibility that some customers would not want to pay a higher premium for the Zillow's Premier Agent subscription services.

      The CAC offers CW statements in an attempt to demonstrate that not all agents were happy with the new pricing model. The CWs allege that churn rate was "high"; that churn rate "got really bad"; and that existing agent customers were "freaking out" and "furious." *Id.* at ¶¶ 56-67. Generally, CW allegations are "disregarded if lacking in specificity." *In re Downey Sec. Litig.*, No. CV 08-3261-JWF, 2009 WL 2767670, *9 (C.D. Cal. Aug. 21, 2009). The market was aware of the possibility of negative agent reaction to Zillow's new pricing model, and the CAC's vague CW allegations are insufficient to render any of Zillow's optimistic statements about the plan fraudulent or misleading. Considering the fraud allegations both individually and

collectively, the Court finds that the CAC fails to satisfy the exacting pleading requirements imposed by the PSLRA and Rule 9(b).

    2. <u>Display Revenue Fraud Allegations</u>

Plaintiffs display revenue fraud allegations fare no better. The CAC alleges that Zillow's statements about the health of its display revenue were false because Zillow failed to alert the market that it planned to terminate its advertising relationship with Foreclosure.com. Dkt. # 52, ¶¶ 109-110. The allegations fail to identify any duty Zillow had to disclose this information. The CAC concedes that Zillow made a business decision to terminate its relationship with Foreclosure.com because it decided to bring foreclosure resources "in-house, as opposed to out-source [them]." *Id.* at ¶¶ 189-90. And it concedes that Zillow chose to "launch[] this competitive product" because it believed it to be "a far superior consumer experience." *Id.* at ¶ 191.

"[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 131 S. Ct. at 1321. The statements at issue concern Zillow's optimism about its display advertising revenue, generally. *See, e.g.*, Dkt. # 52, ¶ 9 ("we do expect our Display category to contribute nicely to the top line"); *id.* at ¶ 116 ("Growth in display revenue depends on continuing growth in traffic to our websites"); *id.* at ¶ 123 (display "contribution margin remains higher than in marketplace businesses, which results in strong flow through from incremental sales to operating profit"). Notably, none of the challenged statements mention Foreclosure.com, and the CAC merely speculates about Foreclosure.com's importance to Zillow's display revenue projections. The CAC's recitation of a few optimistic predictions Zillow made about display revenue is insufficient to satisfy Plaintiffs' pleading burden. *Cf. Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 822-23 (S.D. Cal. 2006) ("to support a claim of fraud a plaintiff must plead with particularity how the

accounting manipulations affected the company's financial statements and whether they were material in light of the company's overall financial position"). Because the CAC fails to plausibly plead that Zillow had an affirmative duty to disclose the loss of Foreclosure.com, the display revenue fraud allegations are also subject to dismissal. For all of these reasons, Plaintiffs have failed to plead materiality and falsity with sufficient particularity. The Court declines to address the remaining elements of the claims.

### D.  § 20(a) Claim

Section 20(a) of the 1934 Act, concerning control person liability, requires proof of an underlying primary violation of the securities laws. 15 U.S.C. §§ 77o & 78t(a); *see also No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). Because the Court has found that Plaintiffs do not adequately allege primary violations under Section 10(b), the Court dismisses the § 20(a) claim as well.

### E.  Leave to Amend

Leave to amend must be granted with "extreme liberality" in securities cases. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The Court recognizes that this is indeed a "technical and demanding corner of the law" and that "the drafting of a cognizable complaint can be a matter of trial and error." *Id.* However, in this case, Plaintiffs' 67 page CAC and the judicially noticed documents provide a robust account of Zillow's financial performance and public disclosures over the Class Period. Despite having offered such a detailed account, the CAC fails to advance any cognizable fraud theory related to Zillow's implementation of the impression-based pricing model or the loss of Foreclosure.com. Importantly, the CAC fails to plausibly plead that Zillow had a duty to disclose ARPU, Premier Agent churn, or its decision to terminate Foreclosure.com. Nor does the CAC plausibly allege

that any statements made by Defendants imposed upon Zillow any such duty. For these reasons and as explained in detail above, the Court is convinced that "the complaint could not be saved by amendment." *Id.*; *see also Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009) (acknowledging that "each case must be evaluated on its own merit" and affirming district court's dismissal with prejudice of consolidated class action complaint). Accordingly, dismissal with prejudice is warranted.

## IV. CONCLUSION

Having considered the motion, the response and reply thereto, the declarations and attached exhibits subject to judicial notice, the CAC, and the balance of the file, the Court hereby finds and ORDERS:

(1) Defendants' Request for Judicial Notice is GRANTED as discussed above;

(2) Defendants' Motion to Dismiss for Failure to State a Claim is GRANTED;

(3) The Class Action Complaint is DISMISSED with prejudice.

Dated this 20 day of October 2014.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE